IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2005

## JOSEPH B. THOMPSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. C48,041   R. Jerry Beck, Judge**

————————————

**No. E2004-00920-CCA-R3-PC - Filed October 12, 2005**

————————————

The Petitioner, Joseph B. Thompson, was convicted of aggravated robbery and aggravated kidnapping, and the trial court sentenced him to an effective sentence of forty years. On direct appeal, this Court affirmed the Petitioner's convictions and sentences. The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because: (1) he received ineffective assistance of counsel; (2) the State caused exculpatory evidence to be lost and unavailable to the Petitioner; (3) the trial court denied his right to allocution; (4) the trial court improperly limited trial counsel's time for closing argument; (5) the trial court erred when it ruled that the Petitioner could not instruct his trial counsel about trial strategy; and (6) the trial court erred by instructing the jury concerning the amount of fines to be imposed. After thoroughly reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Mark H. Toohey, Kingsport, Tennessee, for the appellant, Joseph B. Thompson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Greeley Wells, District Attorney General; and B. Todd Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Sullivan County Jury convicted the Petitioner of aggravated robbery and of aggravated kidnapping. The trial court sentenced the Petitioner to twenty years for each offense, to be served consecutively, for an effective sentence of forty years. On direct appeal, this Court affirmed the

Petitioner's convictions and sentence. <u>State v. Joseph B. Thompson</u>, No. E2002-00061-CCA-R3-CD, 2003 WL 1202979, at *1 (Tenn. Crim. App., at Knoxville, Mar. 17, 2003), *perm. app. denied* (Tenn. 2003). In our opinion, we summarized the facts as follows:

> During the early morning hours of June 20, 1999, the sixty-two-year-old victim, Shirley Huffman, a desk clerk at the Microtel motel in Kingsport, was attacked and beaten by a man wearing a ski mask. The victim, who suffered injuries to her head and face, felt the sensation of being dragged before she lost consciousness. When she briefly regained consciousness, she realized that she was in the restroom adjacent to the manager's office.

> Robin Lynette Blix, also a desk clerk at the motel, testified that the [Petitioner], whom she recognized as an acquaintance of her ex-boyfriend, entered the lobby of the motel through the front door just before midnight. According to Ms. Blix, the [Petitioner] left the lobby before the victim, who began her shift at midnight, arrived for work. She recalled that the victim had locked all of the motel's exterior doors shortly after her arrival. Ms. Blix remembered that the [Petitioner] had been a guest at the Microtel several days earlier, but was not registered on the night of the robbery.

> Alicia Hendrickson, general manager of the Microtel, explained that key cards issued to guests were programmed to open both the individual guest rooms and the exterior doors. She explained that each key card could be used until a new key was created with the same room number. Ms. Hendrickson, who attended the same high school as the [Petitioner], recalled that he was a guest at the motel from June 5 through June 12, and still owed more than $200 for his lodging. She testified that when the [Petitioner] checked into the motel on June 5, he paid for one day and made arrangements to pay for the balance of his stay when he received his paycheck. Ms. Hendrickson explained that she had made a similar arrangement with the [Petitioner] on an earlier occasion and that he had paid the full balance. After being notified of the robbery, Ms. Hendrickson went to the motel and gave the [Petitioner's] name to police based upon the description of the perpetrator provided by other witnesses. Ms. Hendrickson testified that more than $400 was missing after the robbery.

> Robert Wayne Hughes, who was training as a reserve deputy for the Sullivan County Sheriff's Department at the time of the offenses, testified that he and his girlfriend, Suzanne Faye Lawson, arrived in separate cars at the Microtel between 1:00 and 1:30 a.m. As Hughes drove closer to the entrance of the motel, he saw a masked black male, who was wearing dark brown clothing, lurking in a hallway near the lobby. According to Hughes, the individual retreated into the hallway after seeing him outside. Hughes then directed Ms. Lawson to follow him to an adjacent parking lot so that they could not be seen from the lobby. Afterward, Hughes drove back toward the lobby and walked to the call box to summon an attendant. After the victim

allowed him into the lobby, Hughes checked the hallway near the lobby to see if anyone was there. He stated that when he informed the victim that he had seen a man lurking near the lobby, she did not seem concerned, apparently believing that the individual was a registered guest.

Suzanne Faye Lawson, Hughes' girlfriend, testified that she observed an individual, whom she later identified as the [Petitioner], drive a car from the rear parking lot of the motel, park, and then walk toward her vehicle. Ms. Lawson stated that she saw the [Petitioner's] face as he walked within ten feet of her car. She described the [Petitioner] as wearing dark gray clothing and having black hair, a medium complexion, and a slim build. Later, she saw the [Petitioner] enter a back door of the motel. Ms. Lawson remembered that when she informed Hughes that she had seen the [Petitioner] enter through the back door, Hughes checked the floors and then called the front desk to tell the clerk of the [Petitioner's] presence. After the robbery, Ms. Lawson identified the [Petitioner] from a photographic lineup as the individual she had seen enter the motel.

James Alexander Bardinelli and Joel Dingus, employees of a Kroger located adjacent to the Microtel, were standing outside their place of business sometime between 2:00 and 2:15 a.m. They were approached by the [Petitioner], who offered to sell them some sporting tickets. Bardinelli, who identified the [Petitioner] from a photographic lineup, recalled that he and his brother had seen the [Petitioner] the day before. Dingus saw the [Petitioner] drive into the parking lot of the Microtel and enter through a back door.

At 2:39 a.m., Sergeant Dan Brookshire and Officer Mark Osterman of the Kingsport Police Department responded to the silent alarm at the Microtel. Upon their arrival, the front door was locked and there was no clerk located in the desk area. After someone inside opened the door, Officer Osterman examined the front desk area while Sergeant Brookshire stayed in the lobby. Sergeant Brookshire observed a screwdriver stuck in the doorjamb of the restroom located adjacent to the front desk. Officer Osterman, who had seen a large amount of blood on the floor behind the front desk and on the restroom door, was unable to open the restroom door because the screwdriver had been lodged between the door and the frame. When the screwdriver was removed, the officers discovered that the door was locked. After gaining entry by the use of a knife, officers discovered the victim, who was badly injured and lying in a pool of blood.

Detective Penny Kindle of the Kingsport Police Department testified that she interviewed the victim at Wellmont Hospital on the day following the crimes. She took several photographs which depicted the various injuries the victim had suffered during the attack. After the [Petitioner's] arrest, Detective Kindle noticed that [Petitioner's] right hand was swollen.

-3-

Mary Kay Arnold, who was dating the [Petitioner] at the time of the offenses, testified that the [Petitioner] was at her residence until 10:00 p.m. on the day before the robbery. She recalled that he was wearing blue jeans and a red tee shirt when he left. According to Ms. Arnold, the [Petitioner] returned shortly after 3:00 a.m. the following morning. Awakened by the sound of running water in her kitchen sink, she walked downstairs and heard the [Petitioner] say, "Do not come into the kitchen." According to Ms. Arnold, the [Petitioner] was wearing the same clothing he had on earlier in the evening. She noticed that his right hand was swollen. She testified that the [Petitioner] then left the residence and, when he returned shortly after sunrise, he was wearing a yellow shirt, yellow hat, and blue jeans and was carrying a Proffitt's bag. The [Petitioner] handed her a pair of brown suede boots and asked her to discard them. According to Ms. Arnold, the boots had dark red or brown stains on the toe area. She recalled that the [Petitioner] asked her to drive to the Laundromat, where he dumped clothing from a black plastic bag into a washing machine. Ms. Arnold testified that she did not see the clothing that had been in the bag and conceded that she had originally lied to the police regarding the [Petitioner's] whereabouts on the night of the offenses. She explained that she "was scared because [she] had thrown away some boots and my friend told me that he might have been the one."

Officer David Quillen testified that the [Petitioner] asked to speak with him on the day after the robbery. According to Officer Quillen, the [Petitioner] initially denied any involvement, claiming that he had been living in his car and was asleep at the time. Eventually, the [Petitioner] acknowledged that he had been at the Microtel prior to the robbery. When Officer Quillen noticed that the [Petitioner's] right hand was badly swollen, the [Petitioner] explained that he had hit someone but refused to identify the individual. The officer stated that the [Petitioner] at first denied committing the robbery but later qualified his claim, pointing out that "no person saw [him] commit any crime."

Dr. Joann D'Aprile Lukes, who treated the victim, testified that there was a three-centimeter laceration on the victim's left eyebrow, a five-centimeter laceration on her left ear, a one-centimeter scalp laceration, and a one-centimeter laceration on her left middle finger. She described the victim as having extensive swelling on the right side of her face. Her right eye was swollen shut, her lips were swollen, and her entire facial area was black and blue.

Dr. Timothy A. Urbin, a neuropsychologist, observed severe injuries to both sides of the front part of the victim's brain and lesser injuries to the right side of the back part of her brain. He diagnosed the victim with a concussion and Post-Traumatic Stress Disorder. It was his opinion that the victim would experience difficulties with her thought processes for the remainder of her life.

The victim, sixty-five-year-old Shirley Huffman, recalled that just prior to the

attack, a guest warned her that he had seen a man lurking in the lobby. As a result, she removed $200 from the cash drawer behind the front desk and placed it in the safe. Later, just after the same guest telephoned the front desk to tell her that he had seen someone on the second floor of the motel, a light-skinned black male appeared in the lobby, jumped over the counter, and began to beat her with his right fist, eventually threatening to shoot her. The victim testified that she struggled to reach the alarm button but was not sure if it was activated because she eventually lost consciousness. She recalled that when she regained consciousness, she realized that she was on the floor of the restroom and was able to lock the door from the inside. The victim was unable to identify the defendant's face because he wore a ski mask during the attack, but otherwise described him as only slightly taller than her.

Karen N. Lanning, an agent with the FBI, testified for the defense. Ms. Lanning, an expert in the field of fiber and hair analysis, stated that she had examined a number of hairs collected from inside the [Petitioner's] vehicle and determined that none of them belonged to the victim. She also examined hairs found on the victim and concluded that they were not those of the [Petitioner]. Ms. Lanning stated that if the perpetrator were wearing a mask, gloves, a long-sleeve shirt, pants, and boots, she would not expect to find his hair at the crime scene.

Three forensic scientists with the TBI testified for the defense. Hoyt Phillips testified that he compared two latent fingerprints and one palm print found at the scene with the known prints of the [Petitioner] and determined that the prints found at the scene were not those of the [Petitioner]. Joe Minor testified that he examined the accelerator pedal and brake pedal from the [Petitioner's] car and concluded that there was no blood on either. He also found no blood on the floor mats from the [Petitioner's] car. Minor stated that no blood was found on the six pairs of the [Petitioner's] shoes that were tested. Linda Littlejohn compared the [Petitioner's] shoes with impressions left at the scene and determined that none of the shoes tested matched the impression.

Id. at *1-4.

As previously stated, the Petitioner contends, among other things, that he received ineffective assistance of counsel. He asserts that his trial counsel was ineffective in nineteen ways, and he offered testimony in support of each of these claims at the post-conviction hearing. Because of our standard of review, we must examine all the proof presented that is relevant to the Petitioner's claims in this appeal. To that end, the following relevant evidence was presented at the post-conviction hearing:

James Moffitt, a detective with the Kingsport Police Department, testified that, on June 21, 1999, he arrested the Petitioner at an apartment located in a government housing apartment complex in Johnson City, Tennessee. A Johnson City police officer transported the Petitioner to the Johnson

City limits, near Kingsport, and, in Kingsport, a Kingsport police officer took custody of the Petitioner. The detective said that the Petitioner's 1978 Chevrolet Caprice was legally parked in the parking lot of the apartment complex, and the car was confiscated and towed to the Kingsport Police Department. Detective Moffitt did not have a search warrant for the vehicle, and he assumed that, after the vehicle was taken to Kingsport, a search warrant was issued before the vehicle was searched. On cross-examination, Detective Moffitt testified that the apartment belonged to someone other than the Petitioner, namely a woman named Kathy Pierce. He discovered the apartment's address by looking through phone records at the Microtel Inn, which showed that phone calls had been made to the apartment from a room registered to the Petitioner. Detective Moffitt testified that he had a description of the Petitioner's vehicle, which is how he identified the vehicle in the apartment parking lot.

Frank Light, a detective with the Kingsport Police Department, identified a Sullivan County search warrant for the Petitioner's vehicle. Detective Light testified that Detective David Joe Cole told him that he had a valid arrest warrant for the Petitioner, and Detective Light went to Kathy Pierce's apartment to arrest the Petitioner. He said that he went to the apartment complex with other detectives and talked with Pierce, who informed him that the Petitioner was not at the apartment. Detective Light testified that, when he was returning to the police department, he received a page from Pierce informing him that the Petitioner was at her apartment. The detective said that the other detectives returned to the residence looking for the Petitioner's vehicle. When the detective returned to the residence, he knocked on the door, and Pierce answered, and she allowed the police inside the apartment. Detective Light then arrested the Petitioner. On cross-examination, Detective Light testified that Detective Cole informed him that there was an arrest warrant for the Petitioner. Detective Cole also advised him that the Petitioner might be driving a 1978 Caprice, and, before seeing the vehicle at the apartment, Detective Light did not request a search warrant for the vehicle. Detective Light testified that the Petitioner was arrested in Johnson City, and Johnson City police transported the Petitioner to the Sullivan County line. The Petitioner was then taken to the Kingsport City Jail. He stated that the Petitioner's vehicle was towed to Sullivan County, and it was taken as evidence to the Kingsport Police Department.

Detective Cole testified that, as part of this investigation, he recovered a Montgomery Ward receipt when he searched the Petitioner's vehicle. He said that when he first saw the receipt it did not mean anything to him, and he put it in a box labeled "various papers." Detective Cole stated that, subsequently, the victim told him about a second Montgomery Ward receipt found at the crime scene. The detective identified the screwdriver that was found in the door of the bathroom at the Microtel. He said that he accompanied post-conviction counsel and Charles Coomer to the hotel to view the bathroom door and to run a test on the door. When he examined the door, it appeared to be unchanged from the night of the robbery. Detective Cole testified that he found a mark on the door just above the hinge where the screwdriver had been placed during this crime. Detective Cole said that, after determining where the mark was located, he assisted post-conviction counsel by lodging the screwdriver in that same area of the door. Coomer then opened the door without difficulty, and the screwdriver fell on the floor. On cross-examination, Detective Cole testified that he did not know if the screwdriver found at the scene belonged to the hotel, and there were no tools

stored near the area where the screwdriver was found. Based on his investigation, the screwdriver appeared to be placed in the door to keep the door closed, but he thought that the victim locked the door from the inside.

Both sides stipulated that Charles Coomer, a resident of Kingsport, went to the Microtel with post-conviction counsel and Detective Cole, and he witnessed Detective Cole place the screwdriver in the doorjamb. After the screwdriver was placed in the door in two different positions, Coomer opened the door without difficulty.

Dan Brookshire, an officer with the Kingsport Police Department, testified that he responded to the robbery at the Microtel, and, when he gained entrance to the hotel, he found the clerk in the bathroom and a screwdriver lodged into the top of the left side of the door near the hinge. He stated that the door was locked from the inside, and he was unable to open the door by turning the handle. The officer did not know whether the screwdriver prevented the door from opening, and he thought that Detective Moffitt gained access to the door by using either a screwdriver or a knife to open the latch of the door.

Mark Edward Osterman, an officer with the Kingsport Police Department, testified that he responded to an alarm at the Microtel, and, when he arrived, he noticed a screwdriver stuck in the doorjamb near the hinge at the top left side of the bathroom door. He said that the door was locked when he arrived. The officer did not know who removed the screwdriver, he did not recall seeing the door open, he did not remember exactly when the screwdriver came out of the door, and he did not know if the screwdriver in the door prevented the door from being opened.

The Petitioner testified that he initially filed a pro se petition for post-conviction relief in which he alleged that his trial counsel, ("Counsel"), was ineffective for several reasons. The Petitioner asserted that Counsel was ineffective for failing to file several pre-trial motions, and for failing to request a change of venue based upon pretrial publicity. The Petitioner informed Counsel of pretrial publicity that the Petitioner believed was false and prejudicial to his trial. Additionally, the Petitioner stated that Counsel was ineffective for failing to file a motion for individual voir dire of the jury before trial to determine if they had seen or read any of the prejudicial pretrial publicity. Also, based upon this publicity, the Petitioner stated that Counsel should have filed a motion to dismiss the indictment and should have asked the trial court to inquire if the grand jury was influenced by the newspaper article. He stated that he discussed this issue with Counsel on numerous occasions, both in person and by letters.

The Petitioner testified that Counsel was ineffective for failing to file a motion to suppress evidence based on his illegal arrest. He clarified that Counsel ineffectively failed to investigate the fact that his arrest was illegal. The Petitioner alleged that his arrest was illegal because it occurred at an apartment owned by someone other than the Petitioner, and, when the owner asked the police officers if they had a warrant, the officers were obligated to get a search warrant. He said that, instead, the officers entered the home, arrested him, and took his car keys, shoes, and other items from him. The Petitioner testified that the officers wrongfully took him to the Kingsport City Jail

-7-

instead of the Washington County Jail. The Petitioner identified an arrest warrant for him that alleged that he committed aggravated robbery. He noted that the warrant stated that it was applied for by Detective Cole and signed by Dwayne Snodgrass. The warrant stated that it was to be executed at 941 Maple Street, but the Petitioner asserted that Counsel should have challenged the affidavit that supported the warrant because it lacked probable cause. He believed that, had Counsel addressed this issue, his arrest would have been found unlawful and the evidence against him would have been suppressed.

Similarly, the Petitioner testified that Counsel failed to file a motion to suppress a Montgomery Ward receipt that was illegally seized from his car. The Petitioner testified that a search warrant for his vehicle was issued on June 22, 1999, and it gave police "authority to look for blood, clothing, ski masks, Microtel keycard, money, AAU basketball tickets, and any evidence pertaining to aggravated robbery at the Microtel on [June 20, 1999]." The warrant stated that the Petitioner's vehicle was located in the basement of the Justice Center in Kingsport, Tennessee, but the Petitioner had not given anyone permission to move his vehicle from Pierce's apartment. The Petitioner stated that the Montgomery Ward receipt was not listed on the search warrant, and the trial court should have ruled that it was inadmissible. The Petitioner said that there was a second Montgomery Ward receipt found at the Microtel four or five weeks after the robbery, and it was also introduced at trial. The Petitioner testified that he discussed the receipts with Counsel because the Petitioner thought that the receipts were the only physical evidence that linked him to this crime. When the Petitioner discussed the receipts with Counsel, Counsel stated that he did not want to suppress the receipt because that would also result in the suppression of other evidence that was favorable to the Petitioner, such as the forensic evidence that came from the vehicle with test results showing "no match" for the Petitioner. The Petitioner, however, wanted Counsel to argue the illegal seizure of the vehicle and of the receipt. The Petitioner conceded that, at trial, Counsel objected to the introduction of the second receipt, arguing that it was irrelevant and prejudicial. Also, with regard to the receipts, the Petitioner asserted that Counsel was ineffective for failing to object to the chain of custody.

The Petitioner also asserted that Counsel ineffectively failed to file a motion for a speedy trial. The Petitioner testified that he contacted Counsel, prior to any delays in the trial, and specifically stated that he wanted Counsel to file a motion for a speedy trial. He stated that, had this been done, the investigations would have been completed sooner, and he could have possibly located other witnesses for his trial.

The Petitioner testified that Counsel ineffectively failed to investigate the Petitioner's case in several ways. The Petitioner testified that Counsel should have investigated whether the grand jury foreman was properly authorized. He said that the same grand jury foreman indicted him for other offenses, and the foreman was, therefore, not properly authorized. The Petitioner also asserted that Counsel failed to adequately investigate the case by not hiring a private investigator. He said that an investigator was necessary because his case was complicated, and the police investigation was faulty. The Petitioner testified that Counsel failed to adequately investigate the screwdriver in the door. He asserted that Counsel should have conducted tests on the screwdriver found at the hotel

to determine if the screwdriver prevented the victim from exiting the restroom. He stated that, based on these tests, he believed that the State would not have proven the forced confinement element required for aggravated kidnapping.

The Petitioner also asserted that Counsel was ineffective during his trial because he failed to object to the trial court's determination that closing arguments be limited to forty minutes, which was unfair because of the complexity of his case. He agreed that Counsel asked the Court for additional time for his closing argument, and, further, that Counsel raised this issue on direct appeal. During the trial, the Petitioner testified that Counsel was ineffective when he failed to object to the trial court's instruction that trial decisions were to be made by Counsel, not the Petitioner. He also testified that Counsel was ineffective for not attempting to admit a witness' statement to Officer Osterman that implicated someone else in this crime. He asserted that Counsel failed to get that witness' name and address so that the witness would be present at trial. Similarly, he stated that there was exculpatory information from three witnesses who stated that they had observed another black male outside the hotel prior to the robbery. The Petitioner admitted that there were jury-out hearings during the trial on this issue, and the trial court ruled that Officer Osterman could not testify about the statement because it was hearsay. The Petitioner testified, though, that he wanted Counsel to tell the jury about this hearsay statement during his opening statement, which was prior to the trial court's ruling on this issue, in order to establish to the jury that the police were negligent in their investigation. The Petitioner said that he instructed Counsel to tell the jury that the police officers failed in their investigation. The Petitioner also testified that Counsel failed to object to the trial court's instruction to the jury, before their verdict, about the amount of the Petitioner's fine.

The Petitioner asserted that Counsel was ineffective during the sentencing phase of the trial because he failed to object to the trial court's finding not to allow the Petitioner the right of allocution. He explained that Counsel should have objected because the trial court sentenced him without asking the Petitioner if he wished to make a statement in court, and he said that he did not know that he had the right to allocution until after his sentencing hearing. He stated that, if he had been able to speak, he might have been able to persuade the judge not to give him the maximum sentence. He explained that he would have stated that the case was weak and full of errors and that he would have explicitly stated that the screwdriver could not have prevented the victim from leaving the restroom at the Microtel. The Petitioner testified that he asked Counsel to raise this issue in the motion for new trial, but Counsel did not do so, and Counsel did not raise this issue on direct appeal.

The Petitioner asserted that Counsel was ineffective during his direct appeal. First, he testified that Counsel represented him on appeal against the Petitioner's will. He stated that, on December 6, 2002, he filed a civil lawsuit against Counsel. He said that this lawsuit was filed prior to Counsel's submission of his appellate brief and prior to the oral argument in this case. Additionally, the Petitioner stated that he sent letters to Counsel asking Counsel to withdraw, and he filed motions with the appellate court asking that Counsel be removed from his case. The Petitioner testified that Counsel did not file a motion to withdraw until the time period for filing the petition to rehear had expired. He testified that Counsel's failure to file a timely motion to withdraw

prevented the Petitioner from representing himself or getting new counsel appointed. He explained that Counsel should have filed a motion to withdraw when Counsel was notified of the Petitioner's lawsuit against him, but Counsel did not file a motion to withdraw until four months after Counsel was served with the civil lawsuit.

The Petitioner testified that, in his direct appeal, Counsel was ineffective for not raising the issue that the Petitioner's vehicle was illegally searched, and that the Montgomery Ward receipt was inadmissible as fruit of the illegal search. He asserted that this prejudiced him because Counsel would have been successful with this issue on direct appeal. The Petitioner noted that the Court of Criminal Appeals ruled in his direct appeal that the Montgomery Ward receipt found at the Microtel was inadmissible, but that the error was harmless. He asserted that the Court would have found the error harmful if the Montgomery Ward receipt found in his car was also improperly admitted. Therefore, he asserted that he was prejudiced by Counsel's failure to appeal this issue.

The Petitioner asserted that Counsel was ineffective because Counsel breached a written contract with the Petitioner. The Petitioner testified that, according to the contract, Counsel was supposed to file a supplemental brief that the Petitioner had drafted with Counsel's appellate brief. The Petitioner testified that his mother delivered the Petitioner's supplemental brief to Counsel's office, but Counsel never filed the supplemental brief. He stated that he attempted to file his pro se brief with the Court, but his request was denied because the Petitioner was represented by Counsel. The Petitioner testified that his supplemental brief contained issues not raised by Counsel's appellate brief, and he believed that, if Counsel had raised those issues, he may have had a different result on appeal. The Petitioner testified that Counsel failed to provide him with a copy of Counsel's appellate brief prior to filing the brief.

On cross-examination, the Petitioner testified that he did not tell Counsel that he had an "alibi," but he told Counsel that he was at Club Harvey's on the night of this crime, and he asked Counsel to talk to Marshall Dover, a doorman at Club Harvey's to verify this. The Petitioner testified that he met with Counsel on this case "no more than five times," not sixteen times. The Petitioner testified that Counsel did not tell him that the State had turned its file over to Counsel, and he did not receive copies of everything in the file.

With regard to the pretrial motions, the Petitioner testified that he told Counsel that, unless something was planted in his vehicle, there was nothing from his vehicle that would connect him to this crime. The Petitioner testified that he filed a number of newspaper articles containing pretrial publicity. He said that the trial court asked the jurors if they had read any of the newspaper articles, but none had. The Petitioner testified that he wanted the Montgomery Ward receipt from his vehicle excluded, but he also wanted other evidence from the search that was beneficial to him to be admitted. The Petitioner testified that he compared the receipt found at the hotel with the receipt found in his vehicle, and he told Counsel that the receipt from the vehicle was his, and the other receipt could belong to him. He testified that Counsel failed to file a motion to suppress his arrest, which he asserted was illegal because he was taken to Kingsport and not to the Washington County Jail. He explained that he should have been taken to the nearest magistrate. The Petitioner admitted

-10-

that Kingsport had a warrant for his arrest, but he stated that there was no probable cause to issue the warrant. The Petitioner testified that Counsel should have hired a private investigator to investigate the officers, crime scene, and the evidence, and he stated that Counsel did not investigate or go to the scene himself.

The Petitioner testified that Counsel did not move for a speedy trial, even though he told Counsel that he wanted to "move on with this case fast as possible" in late 1999 or early 2000. The Petitioner testified that he did not recall asking for a continuance on January 18, 2000, to obtain reports and evidence from the TBI and the FBI. He said that he and Counsel agreed with the State's request for a continuance to obtain test results from the TBI or FBI, which he stated did not place him at the scene. The Petitioner did not recall if the State asked for a continuance on July 17, 2000, or if the defense requested a continuance on September 18, 2000. The Petitioner testified that Officer Osterman's testimony created the need for a continuance on February 21, 2001. He concluded that, of four continuances, he only remembered that the defense asked for one. He agreed that, if any of the agents could not appear in court, the defense would have been forced to request a continuance to get their testimony on the record. He stated that, after the defense determined that the evidence was beneficial to the Petitioner, the defense would have wanted those witnesses to testify.

The Petitioner recalled telling Counsel during trial that Counsel had done a good job on some of the issues. The Petitioner said that, after the trial, and at sentencing, he wanted to speak to the trial court about his sentence. He identified a sentencing report that stated that "the [Petitioner] did not wish to make a statement." The Petitioner testified that he and Counsel were present during his sentencing, and he recalled that there was no presentence hearing report for this case, so the presentence report for a different case was utilized.

The Petitioner testified that he asked Counsel to withdraw from this case on numerous occasions, both prior to and during the appeal, but Counsel refused to withdraw. He identified a document showing that the Court of Criminal Appeals denied Counsel's motion to substitute counsel because the Petitioner did not show good cause for the removal of his attorney. He stated that Counsel has represented him on several other cases, some of which are still pending. The Petitioner testified that he filed a malpractice lawsuit against Counsel, which was dismissed because the Petitioner was unable to a pay an independent attorney to file an affidavit stating that Counsel's conduct was negligent. The Petitioner received a letter from Counsel on March 26, 2003, stating that Counsel could not represent the Petitioner because the Petitioner filed a lawsuit against Counsel. He said that Counsel actually withdrew on April 2, 2003, one day prior to the time limit for filing a motion for rehearing. The Petitioner conceded that Counsel gave him a copy of his appellate brief after it was filed.

Counsel testified about his investigation and preparation for trial. He said that, for this case, he met with the Petitioner sixteen times to prepare for trial and to discuss issues related to the Petitioner's case, and each meeting lasted between thirty minutes and two hours. Counsel testified that he also met with the Petitioner several other times, and he received about thirty or more phone

-11-

calls from the Petitioner. Counsel testified that he had open-file discovery from the State, meaning that he had access to everything in the State's file other than work product. He said that he had access to all witnesses' statements before trial, but he remembered that some witnesses did not give a statement. Counsel testified that he went through the file, page-by-page, copied whatever he needed and took notes, and he provided the Petitioner with a copy of everything he had, including the witnesses' statements. Counsel stated that the Petitioner called and asked specifically about the witnesses' statements, and he said he was sure that the Petitioner had every witness statement that Counsel had. He said that, in comparison to his other criminal defense cases, the State in this case provided him the most access to the prosecution's file, and anything he asked to see he was given. Counsel testified that he never thought about hiring an investigator, and he did not recall if he discussed this issue with the Petitioner. He testified that he spent approximately 149 hours out-of-court on the Petitioner's case, he interviewed all of the officers and witnesses, and he went to the hotel and surrounding area a couple of times.

Counsel recalled that, during his investigation, the Petitioner mentioned a potential alibi, but at different times the Petitioner gave him different alibis. Counsel testified that the Petitioner admitted he was at the crime scene, and several witnesses placed the Petitioner at the Microtel. Counsel agreed that the Petitioner stated that he was in the area selling stolen AAU tickets when he returned to the Microtel, and, another time, the Petitioner told Counsel that he was selling cocaine in the area and at Harvey's Club. He did not recall the Petitioner wanting to use these illegal activities as an alibi. Counsel testified that the Petitioner mentioned Mary Kay Arnold as a potential alibi witness, but the Petitioner was adamant that he did not want Arnold involved.

Counsel testified that he and the Petitioner discussed the reasons for, and against, filing a motion for a speedy trial. Counsel stated that the first trial date was January 18, 2000, and he and the Petitioner agreed to ask for a continuance in order to get evidence from both the TBI and FBI. He explained that this evidence was beneficial to the Petitioner, and he and the Petitioner decided that they did not want to proceed to trial without it. Counsel explained that the Petitioner was adamant that none of the evidence would link him to the crime, and the Petitioner stated there would be no blood, fibers, or shoe prints connecting the Petitioner to the hotel. On the next trial date, July 17, 2000, the State filed a motion for a continuance because Detective Cole was going to be out of town. Counsel testified that he opposed this motion, but the trial court granted the State's motion. The trial was set for September 18, 2000, but, on that date, Counsel said that he filed a second motion for a continuance because some of the expert witnesses from the TBI and FBI could not be present for trial. Counsel said that the State proposed that they stipulate to the testimony of the experts, but the Petitioner wanted the experts to testify in court. Counsel testified that the trial date was moved to February 21, 2001, and, close to that date, Counsel requested another continuance to investigate evidence of a statement that Officer Osterman heard about the crime. Counsel testified that this evidence was previously unknown to the defense. Counsel testified that the Petitioner agreed to the continuance, and the trial court granted the continuance and set the trial date for July 23, 2001, and the trial proceeded on that date.

Counsel testified that he and the Petitioner discussed the issue of suppressing the evidence

from the Petitioner's vehicle. He stated that "it was a very fine line" because most of the evidence from the vehicle helped the defense. He said that because the crime was so violent the lack of forensic evidence in the Petitioner's car was very important to the defense. Counsel testified that he and the Petitioner discussed this issue several times, and they decided that they wanted the evidence to be admitted. With regard to the motion for change of venue, Counsel testified that he had no indication that the grand jury had been tainted by newspaper articles, and he did not recall discussing this with the Petitioner. Finally, concerning the motion to suppress the Petitioner's arrest, Counsel testified that, while he was aware that the Petitioner was arrested in Johnson City, which is located in Washington County, not Sullivan County, he was unaware that there was anything illegal about the Petitioner's arrest. He opined that any motion regarding the Petitioner's arrest would have been frivolous.

Counsel testified that, during trial, the Petitioner's comments about Counsel's performance were very positive, and the Petitioner indicated that he was pleased with Counsel's handling of the case. He remembered that the Petitioner wanted Counsel to present in opening arguments the statement that Officer Osterman had heard, but the judge had ruled that the statement was inadmissible hearsay. Counsel testified that he had the opportunity to cross-examine Officer Osterman, and he referenced and challenged the way the officer handled the crime scene. Counsel testified that, during this cross-examination, he went through the information that the Petitioner wanted him to cover. Counsel also recalled that, after closing arguments and during jury deliberation, the Petitioner was confident that the jury would acquit him. Counsel testified that he and the Petitioner resolved their issues about the case either in person or on the phone, and he said that there were no unresolved issues. Counsel testified that he was certain that the Petitioner would have told him if the Petitioner had any unresolved issues.

Counsel testified that he and the Petitioner had discussions about the Petitioner's sentencing. He stated that they reviewed the presentence report, the victim impact statements, and the Petitioner's prior convictions to ensure that all of these were accurate. The Petitioner did not indicate that the report was inaccurate or that it omitted information.

Counsel testified that the Petitioner filed a civil rights complaint against him on December 6, 2002, twelve days after oral arguments before the Court of Criminal Appeals. He testified that he received an order from the Court of Criminal Appeals on December 16, 2002, denying the Petitioner's request to remove Counsel. Counsel testified that one of the Petitioner's complaints involved Counsel's refusal to file a supplemental brief that the Petitioner drafted. He said that he had received this document from the Petitioner, but he had not agreed to submit the brief. Counsel stated that he read the Court of Criminal Appeals decision when it was released, and, at that time, he sent a letter to the Petitioner informing him that Counsel would make a request to withdraw. He testified that the letter also informed the Petitioner that he could appeal his case, and the letter set forth the deadlines in the Petitioner's case. Counsel stated that he also sent this information to the Court of Criminal Appeals.

On cross-examination, Counsel again testified about the Petitioner's complaint that he was

ineffective for failing to file pretrial motions. He said that he knew that he could have filed a motion to exclude the Montgomery Ward receipt obtained from the Petitioner's car without requesting that other evidence from the car be suppressed. He testified that he did not recall whether he filed a motion in this case, but he knew that he had raised the issue on the morning of the Petitioner's trial. Counsel conceded that he knew about the two Montgomery Ward receipts well in advance of trial, but he and the Petitioner were not concerned about the receipt from the vehicle because it was irrelevant. Counsel testified that he and the Petitioner were concerned about the receipt found in the victim's belongings because that was the only piece of evidence that placed the Petitioner on the side of the counter with the clerk. About the speedy trial motion, Counsel testified that he and the Petitioner discussed the speedy trial issues but had resolved those issues. He explained to the Petitioner that, by agreeing to or seeking continuances, the Petitioner was giving up his right for a speedy trial. About the motion to suppress the Petitioner's arrest, Counsel testified that he reviewed the arrest warrant to determine if probable cause existed, and he discussed this with the Petitioner. About the motion for a change of venue, Counsel testified that he first became aware of newspaper articles about the crime when he first met with the Petitioner, and he did not file a motion for a change of venue or for individual voir dire of the jurors. He explained that he felt that, by filing a motion, the issue would be brought to the jurors' attention. Counsel testified that he did not recall any jurors having knowledge of the case, which surprised him.

With regard to his investigation of this case, Counsel testified that, when he was appointed to the case, he met with Detective Cole first to determine the names of the officers that were present at the crime scene. He stated that he then interviewed every officer that was present at the crime scene. He testified that he interviewed Officer Osterman, and the officer did not tell him that the officer had heard a third party statement. Counsel recalled that he thoroughly discussed the crime scene with Officer Osterman, and he testified that Officer Osterman never mentioned the statement until just before the February 2001 trial date. Counsel testified that this statement was helpful to the defense, and he said that Officer Osterman offered no explanation on why it took him so long to recall this statement. Counsel testified that he went to the Microtel on at least two occasions, but he did not attempt to determine whether the screwdriver prevented the door from opening. He explained that he inspected the door and the bathroom, and he spoke with the officers about this issue. Counsel testified that the Petitioner complained that no tests had been done on the door early on, but Counsel decided that it was best to not test the door and to argue that the State failed to prove that the screwdriver prevented the door from opening. Counsel said that he also raised this issue on appeal.

Counsel testified that, just before closing arguments, the Petitioner demanded that he raise the issue of an illegal arrest. Counsel thought that he did not have enough facts to support this issue, so he approached the trial court, and the trial court ruled that he could not address this issue. He testified that he did not raise the issue of illegal arrest on appeal. He explained that his understanding of the Petitioner's argument related to the illegal arrest is that Sullivan County officers arrested the Petitioner in Washington County, and he stated that he did not think that the Petitioner's arrest was illegal. Counsel testified that he explained to the Petitioner that the Petitioner had a right to speak at his sentencing, but the Petitioner chose not to speak. He said that the Petitioner felt that

-14-

this was an issue to raise on appeal. Counsel did not recall if he had ever tried an aggravated robbery or aggravated kidnapping case before the Petitioner's case, but he stated that he had tried felonies of every class.

Counsel testified that, at various stages throughout his representation, the Petitioner would communicate that he was satisfied or unsatisfied with Counsel's performance. Counsel testified that the Court of Criminal Appeals ruled, on more than one occasion, that there was not just cause for Counsel's removal. He stated that, after oral argument, he did not feel that he needed to withdraw because he was waiting for the opinion to be released. Counsel testified that he reviewed the Petitioner's supplemental appellate brief for any legitimate issues, but he did not see any issues in the supplemental brief that he thought should have been raised on appeal. Counsel thought that he had addressed every issue he could legitimately raise with the Court of Criminal Appeals. He stated that it was not his understanding that he agreed with the Petitioner to file the supplemental brief.

Counsel testified that he did not raise some of the issues that the Petitioner complained about during the post-conviction hearing in the Petitioner's direct appeal. Counsel testified that he met with the Petitioner prior to filing a motion for new trial, and he stated that they went through each of the issues that the Petitioner had written down. Counsel recalled that they reached a resolution on each of the issues, and he said that the Petitioner was satisfied. He stated that, except for the illegal arrest issue which he thought lacked merit, he raised those issues on appeal. Counsel said that he raised thirteen issues on appeal, including the issue about the statement that Officer Osterman heard, which was an important one to the Petitioner. Counsel said that he did not raise issues that he deemed frivolous because they were unsupported by law. Counsel recalled that the Petitioner was satisfied with the thirteen issues raised on appeal. He said that he raised the issue, on appeal, of how many photographs were introduced about the victim's injuries, and he testified that the Court of Criminal Appeals determined that the issue was harmless error.

On redirect examination, Counsel testified that he made a motion to exclude items at trial, and he called the trial court's attention to the issue of the Petitioner's illegal arrest, and the court ruled on that issue. Counsel stated that, with regard to the failure to subpoena witnesses, the Petitioner had certain people transported from the Department of Correction, including the Petitioner's brother, but once the witnesses arrived, the Petitioner decided that he did not want to call them as witnesses. He testified that the Petitioner did not give him the names of any witnesses to subpoena to support the Petitioner's alibi or any other defense at trial.

Based upon this evidence, the post-conviction court issued an extensive order of dismissal addressing numerous issues and concluded:

> The [P]etitioner is not entitled to Post Conviction Relief upon any issue, or any of his testimony, or any combination of issues, or upon his conclusions that he is entitled to Post Conviction Relief, whether or not specifically addressed [in this order].

> **WHEREFORE** the Post Conviction Petition is dismissed and the prayer for relief

is denied upon this Court's finding that the [P]etitioner has failed to prove by clear and convincing proof that he is entitled to Post Conviction Relief or that he has failed to establish actual prejudice.

It is from this order of the trial court that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that: (1) he received ineffective assistance of counsel; (2) the State caused exculpatory evidence to be lost and unavailable to the Petitioner; (3) the trial court denied his right to allocution; (4) the trial court improperly limited trial counsel's time for closing argument; (5) the trial court erred when it ruled that the Petitioner could not instruct his trial counsel about trial strategy; and (6) the trial court erred by instructing the jury concerning the amount of fines to be imposed.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

### A. Ineffective Assistance of Counsel

The Petitioner claims that the post-conviction court erred when it dismissed his petition because Counsel was ineffective in four ways: (1) for failing to file several pretrial motions; (2) for failing to adequately investigate the case; (3) for failing to adequately represent him at trial and during sentencing; and (4) for failing to adequately represent him on appeal. The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether

the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

### 1. Pretrial Motions

The Petitioner asserts that Counsel was ineffective for failing to file five different pretrial motions: (a) a motion to suppress the seizure of his vehicle and, relatedly, a motion to suppress the Montgomery Ward receipt found in the vehicle; (b) a motion to suppress fruits of his arrest; (c) a motion for change of venue; (d) a speedy trial motion; and (e) a motion to hire a private investigator.

### a. Motion to Suppress Vehicle Search

The Petitioner contends that Counsel was ineffective for failing to file a motion to suppress all the evidence obtained from search of the Petitioner's vehicle because it was illegally sized. The State responds that Counsel was not ineffective for failing to file a motion to suppress because much of the evidence from the Petitioner's vehicle was helpful to the Petitioner. Additionally, the Petitioner contends that Counsel was ineffective for failing to file a motion to suppress the Montgomery Ward receipt found in the Petitioner's vehicle. The State counters that Counsel was

not ineffective because neither Counsel nor the Petitioner was concerned with the receipt, and neither saw the value of attempting to suppress the receipt. Further, the State asserts that the Petitioner did not prove prejudice.

With regard to whether Counsel was ineffective for failing to file a motion to suppress the Petitioner's vehicle's seizure, the post-conviction court found:

The [P]etitioner was arrested in or at a home of a third party in Johnson City, Tennessee (Washington County), and not out of his automobile. As a result, the seizure of the vehicle was not a true and full Carroll doctrine seizure, but the officers had exigent circumstances.

The officers knew the [P]etitioner's car and Frank Light, Kingsport Police Department officer, had a belief that the car had been used in criminal activity . . . . In any case, the car was parked at a housing project parking lot and was evidently mobile and capable of being operated.

The police did not search the car at the scene, but opted to tow the car to Kingsport (Sullivan County) and then attempt to obtain a search warrant from a Sullivan County General Sessions Judge.

. . . .

Here, the police officers testifying at the Post Conviction hearing were about five (5) years removed from the seizure and their memory at the time. The automobile to be seized was in a public parking lot and mobile and the officer was able to remember they had reason to believe the car was used in a crime. Also see: search warrant.

In such circumstances, the Court cannot find the seizure or search was unreasonable notwithstanding that some lack of detail supplied by the officers at the Post Conviction hearing, to wit: generally car matches description of car at . . . scene of crime. The [P]etition[er] seems to only say his car was seized; therefore, original trial [counsel] was ineffective.

Further, original defense counsel testified that the police were searching for blood that may have been carried into some portion of the car due to the great bloody injury to the victim. The police checked the car out from stem to stern [driver's compartment to trunk where the papers/receipt were found]. The [original counsel] indicated that he and the [Petitioner] were anxious to show that the lab report came up zero in regards to the victim's blood. Clearly, a trial tactic was involved.

-18-

The post-conviction court concluded:

> The towing of the car issue is without merit and the [P]etitioner has failed to prove by clear and convincing evidence that the [P]etitioner's original counsel was ineffective to raise the towing [seizure] or search of the car issue at trial or on appeal. Further, the [P]etitioner has failed to establish that he was prejudiced.

We conclude that the evidence does not preponderate against the post-conviction court's findings. The evidence shows that Counsel discussed with the Petitioner several times the issue of suppressing the evidence from the Petitioner's vehicle based on its allegedly illegal seizure. The two concluded that Counsel should not file such a motion to suppress all the evidence found as a result of the car's search and seizure because much of the evidence, or rather the lack of blood evidence, found in the car was favorable to the Petitioner. Indeed, the lack of forensic evidence from the car was an important part of the Petitioner's defense. Clearly, this was a tactical decision, and we will not find Counsel ineffective merely because a different procedure might have produced a different result. See Williams, 599 S.W.2d at 279-80. Under these circumstances, the Petitioner has not proven that Counsel was ineffective, and he has not shown how he was prejudiced.

The Petitioner next contends that Counsel was ineffective for not filing a motion to suppress the Montgomery Ward receipt that was found in the Petitioner's car. The Petitioner asserts that the search warrant for the Petitioner's vehicle did not list items such as a receipt, and, therefore, a motion to suppress the receipt would have been successful had it been filed by Counsel. Furthermore, the Petitioner contends that, had this receipt been successfully suppressed, he would not have been convicted. The State counters that Counsel was not ineffective in this regard because neither he nor the Petitioner were concerned with the receipt because it was irrelevant. The post-conviction court found:

> The importance of the Montgomery Ward receipt taken from the car was that it contained similarities with a Montgomery Ward receipt found at the scene of the crime. In the State's theory at trial, the Montgomery Ward receipt from the car would connect the [P]etitioner to the Montgomery Ward receipt found at the scene. . . . The Montgomery Ward receipt from the vehicle had no significance in itself, unless considered in relation to the Montgomery Ward receipt found at the scene bearing the name Thompson. . . .
>
> The Montgomery Ward receipt found at the scene of the crime [not the one found in the vehicle] was directly addressed on appeal. . . . Basically on direct appeal, the Appellate panel determined that the Montgomery Ward receipt should not have been admitted into evidence . . . and indirectly found that the Montgomery Ward receipt found in the vehicle did not tend to authenticate the Montgomery Ward receipt found at the scene. . . . Notwithstanding, the error of the trial court, the Appellate panel found the admission of the Montgomery Ward receipt found at the scene to be harmless error beyond a reasonable doubt. . . . .

The post-conviction court concluded that Counsel was not ineffective for failing to move to suppress the Montgomery Ward receipt found in the Petitioner's car, and, further, the Petitioner had not proved prejudice.

We conclude that the evidence does not preponderate against the post-conviction court's conclusion. The evidence showed that Counsel and the Petitioner were not concerned about the receipt found in the Petitioner's vehicle because it was "irrelevant." The two were concerned with other items found in the car, and Counsel filed a motion to suppress those items. Counsel's theory involved showing that there were innocuous items in the car, including a Montgomery Ward receipt. This receipt then became important only when the State used it to tie the Petitioner to the crime by showing that a similar receipt was found at the crime scene. We cannot judge Counsel's performance in hindsight, but we must judge it from Counsel's perspective at the time. Cooper, 849 S.W.2d at 746. Under these circumstances, we cannot conclude that Counsel was ineffective for failing to file a motion to suppress the receipt found in the Petitioner's car.

### b. Motion to Suppress Fruits of Arrest

The Petitioner contends that Counsel was ineffective when he failed to file a motion to challenge the Petitioner's arrest and to suppress evidence obtained as a result of the arrest, because the arrest warrant, by which the Petitioner was arrested, was issued without probable cause. The State asserts that the Petitioner has failed to demonstrate that his arrest was illegal, and, therefore, Counsel was not ineffective for failing to file a motion to suppress the Petitioner's arrest warrant. The post-conviction court stated the following:

> The [P]etitioner says that after the robbery and kidnap[p]ing in Kingsport, Sullivan County, Tennessee, he was arrested in another's home in Johnson City, Washington County, Tennessee. . . . [The Petitioner] says they just came in and got him. The [P]etitioner says things were taken from his person, but does not describe anything inculpatory or anything taken from his person. Further, the [P]etitioner did not establish his standing to object.

> In any case, the State offered testimony at the Post Conviction hearing of the officers that made the arrest. . . . The State's witness at the Post Conviction hearing [Moffitt and Light] indicated that they were aware that an arrest warrant was issued. They believed the [Petitioner] was at a particular home in Johnson City [Washington County, Tennessee]. They went to the home and the owner stated that [the Petitioner] was not there. The police asked the homeowner to call if [the Petitioner] showed up later. . . . Later, the homeowner called the police to tell them that the [Petitioner] had showed up at her house. . . . The Kingsport Police accompanied by Johnson City Police Officers returned to the home of the third party and knocked on the door. The [Petitioner] was seen at the house and was arrested and taken into custody.

The Court credits the testimony of the officers testifying at the Post Conviction hearing. . . . The allegation that original defense counsel was ineffective for not attacking the arrest is without merit.

We conclude that the evidence does not preponderate against the post-conviction court's findings. Prior to closing arguments, the Petitioner asked Counsel to raise the issue of an illegal arrest. Counsel specifically stated that he did not think that there was anything illegal about the Petitioner's arrest. The Petitioner bears the burden of proving that Counsel was ineffective. Our review of the record supports the post-conviction court's finding that Counsel's performance in this regard was within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. Further, to show prejudice, the Petitioner must prove that the outcome of the trial would be different. Accordingly, he must show that this motion would have been granted. From the evidence before us, we cannot conclude that a motion to suppress the arrest warrant would have been successful, and, therefore, the Petitioner cannot meet the prejudice prong of our analysis. The Petitioner is not entitled to relief based upon this issue.

### c. Motion for Change of Venue

The Petitioner alleges that Counsel was ineffective for failing to move for a change of venue. He asserts that a change of venue was necessary due to pretrial publicity. The State responds that the Petitioner has failed to show that Counsel was ineffectiveness or that the Petitioner was prejudiced by Counsel's performance. Regarding this issue, the post-conviction court found as follows:

> The [P]etitioner alleges his original trial counsel was ineffective for not seeking a change of venue. . . . The [P]etitioner offered newspaper clippings of news stories from the Kingsport Times News, a newspaper of general circulation in Sullivan County, Tennessee. . . . The voir dire conducted at the original trial indicated that the prospective jurors were questioned in some detail about any prior knowledge of the allegations . . . . Upon a review of the trial transcript . . . evidence it appears that the [Petitioner] had a fair jury and that steps were taken to insure that the jury was not tainted by outside influences such as news stories. . . . This issue is without merit.

"[V]enue may be changed . . . if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity. State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981). Prejudice will not be presumed by a mere showing that there was considerable pretrial publicity. Dobbert v. Florida, 432 U.S. 282, 303 (1977); State v. Kyger, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989). Relevant factors to consider in determining whether to grant a motion for a change of venue include:

1.  Nature, extent, and timing of pre-trial publicity.
2.  Nature of publicity as fair or inflammatory.
3.  The particular content of the publicity.
4.  The degree to which the publicity complained of has permeated the area from which the venire is drawn.
5.  The degree to which the publicity circulated outside the area from which the venire is drawn.
6.  The time elapsed from the release of the publicity until the trial.
7.  The degree of care exercised in the selection of the jury.
8.  The ease or difficulty in selecting the jury.
9.  The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.
10.  The defendant's utilization of his peremptory challenges.
11.  The defendant's utilization of his challenges for cause.
12.  The participation by police or by prosecution in the release of publicity.
13.  The severity of the offense charged.
14.  The absence or presence of threats, demonstrations or other hostility against the defendant.
15.  Size of the area from which the venire is drawn.
16.  Affidavits, hearsay, or opinion testimony of witnesses.
17.  Nature of the verdict returned by the trial jury.

State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979).

In our view, the Petitioner has failed to present specific evidence of any prejudice to the verdict.  Counsel stated that he was aware of the newspaper articles about the crime but he did not recall any of the jurors having knowledge of the case.  He realized that, if he filed a motion for change of venue, the jury pool may be tainted, and, it was to the Petitioner's advantage to not file such a motion because there were two years for people "to forget the incident."  Counsel thought that the issue would be brought up again if he filed a motion to change venue.  Further, Counsel had no indication that the grand jury had been tainted by newspaper articles.

We conclude that Counsel's decision not to request a change of venue "falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462.  Counsel made a strategic decision to not file a motion to change venue in order to minimize the possibility of jurors recalling any publicity about the case.  Further, the Petitioner presented no evidence that Counsel failed to consider those factors listed in Hoover.  Moreover, even if we were to find that Counsel erred, the Petitioner has presented no evidence of prejudice or that the outcome of the trial would be different.  Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### d.  Speedy Trial Motion

The Petitioner next contends that Counsel was ineffective for failing to file a motion for a

speedy trial. The State asserts that by agreeing to continuances that benefitted his case, the Petitioner gave up his right to a speedy trial. The post-conviction court did not specifically address this issue, but it concluded that the Petitioner "is not entitled to Post Conviction Relief upon any issue, or any of his testimony, or any combination of issues, or upon his conclusions that he is entitled to Post Conviction Relief . . . ." Further, we note that the post-conviction court stated the following about the credibility of witnesses:

> In reaching this opinion, the Court observed the [P]etitioner's demeanor while testifying, his own statements that he put things in the Post Conviction pleading under oath without any basis for the allegation, etc. The Court finds that the [P]etitioner has no credibility before this Court. The Court finds that original trial counsel is fully entitled to belief and is credible in his testimony before this Court.

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI; see State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001). Similarly, the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . a speedy public trial." Tenn. Const. Art. I, § 9; see Simmons, 54 S.W.3d at 758; see also Tenn. Code Ann. § 40-14-101 (2003) (stating "In all criminal prosecutions, the accused is entitled to a speedy trial . . . ."). The speedy trial guarantee is designed to protect the accused from oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that the accused's defense will be impaired by dimming memories or lost evidence. Simmons, 54 S.W.3d at 758; see Doggett v. United States, 505 U.S. 647, 654 (1992); State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). The United States Supreme Court enunciated a four-factor balancing test for courts to apply when evaluating a claim that the accused was denied a speedy trial: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice suffered by the defendant from the delay." Simmons, 54 S.W.3d at 759 (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).

At the post-conviction hearing, testimony was presented that, during the Petitioner's case, there were several continuances, and the defense asked for some of these continuances. The Petitioner's trial was initially set for January 18, 2000, but he and the Petitioner agreed to ask for a continuance in order to get evidence from the TBI and FBI that would help the Petitioner's case. The trial was moved to July 17, 2000, and the State was granted a continuance, although Counsel objected, because one of the officers would be unavailable to testify at trial. The trial was then set for September 18, 2000, when, again, Counsel filed a second motion for a continuance because some expert witnesses could not be present for trial. The State proposed a stipulation as to the testimony of the experts, in order to proceed to trial, but the Petitioner wanted the experts to testify in court. The trial was then moved to February 21, 2001, and, prior to that date, Counsel learned of Officer Osterman's statement. Counsel and the Petitioner discussed this and decided that it would be advantageous to request another continuance in order to fully investigate this new information. The trial was set for July 23, 2001, and it proceeded on that date. We conclude that the evidence does not preponderate against the post-conviction court's conclusion that the Petitioner was not denied

effective assistance of his counsel in this instance.  We cannot conclude that the Petitioner has met his burden of showing that Counsel's performance was deficient.  Further, he has not proven prejudice.

### e.  Motion to Hire a Private Investigator

The Petitioner asserts that Counsel was ineffective because he failed to make a motion for a private investigator to investigate the Petitioner's case, especially because the case was so complex.  The State contends that Counsel was not ineffective for failing to hire a private investigator, and, further, the Petitioner has not established how a private investigator would have helped his case.  The post-conviction court found, summarily, that the Petitioner was not entitled to relief on this issue.

Counsel testified that he never thought of hiring a private investigator, but he spent approximately 149 hours on the case, he went to the crime scene and surrounding area, and he interviewed all of the officers and witnesses.  Further, Counsel sought and was given a six-month continuance in order to investigate a statement heard by Officer Osterman.  We conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel was not ineffective.  Further, the Petitioner has not demonstrated how he was prejudiced by Counsel's alleged failure to seek the services of a private investigator.  Therefore, the Petitioner is not entitled to relief on this issue.

### 2.  Investigation

The Petitioner next contends that Counsel was ineffective because he failed to adequately investigate this case by: (1) not conducting tests on the screwdriver; (2) not investigating lost and exculpatory evidence; and (3) not investigating whether the grand jury foreman was properly authorized.

### a. Screwdriver Test

The Petitioner contends that Counsel was ineffective because he failed to perform tests on the screwdriver used to prevent the victim from leaving the bathroom to determine if the screwdriver actually prevented the opening of the bathroom door.  The State asserts that Counsel made a strategic decision to not perform such tests on the screwdriver, and, further, the Petitioner has not established prejudice.  The post-conviction court stated the following:

> [T]he [P]etitioner says that . . . [C]ounsel should have performed a test or had a test performed to determine if a screwdriver placed in a bathroom door at the scene of the crime would have actually prevented the victim from leaving the bathroom where the [Petitioner] placed her (victim) after beating her senseless, dragging her bleeding body to the bathroom, putting her inside and putting a screw driver in between the door and the door jam.

-24-

The police that arrived at the scene of the crime observed a screwdriver jammed into the crack between the door and the jam. The theory at trial was that the screwdriver was placed in the door jam to prevent the victim from escaping her confinement.

At trial, it was established that the victim locked the door from the inside and this was commented on in the opinion on direct appeal.

The [P]etitioner in anticipation of the Post Conviction hearing attempted to establish by test that the door could be opened notwithstanding the screwdriver being placed in the door jam and offered witnesses to say the door could be opened notwithstanding the screwdriver in the door jam. The [P]etitioner offered no exacting proof from a recreation standpoint as to the condition of the screwdriver on the night of the robbery except as to location.

. . . .

In the case, there is no question . . . that the victim was placed in the bathroom so detection of the crime could be avoided and to prevent the . . . victim from summonsing help and that the robber placed the screwdriver in the door jam from the outside in an attempt to keep her in the bathroom and that the placement of the injured victim placed [the victim] in greater danger. Further, the robbery took place at the check-in counter, not the bathroom. The victim was only placed in the bathroom after she was seriously injured bleeding and beaten senseless. . . .

The allegation that [C]ounsel was ineffective because he failed to perform a test on the door is not proven to be clear and convincing evidence. Further, this is a previously decided issue.

Also, the persons who performed the test in anticipation of the Post Conviction hearing appeared to be healthy men, not a person of elderly years that had been beaten senseless. Irregardless of whether or not the screw driver would have prevented the victim's escape from the bathroom, there is absolutely no question that the victim was placed in a much greater danger. In her condition to even open a closed door would have been an ordeal or impossible. When the police arrived at the scene, she was in such bad condition that they thought she was dead.

We conclude that the evidence does not preponderate against the post-conviction court's findings. In Counsel's investigation, he inspected the door at the crime scene, and he spoke with the police officers that were present at the scene. Counsel's strategy was to attack the State's proof, and to argue in both opening and closing argument that the State had not proven that the screwdriver prevented the door from opening. Furthermore, the State's evidence at trial showed that the door was locked from the inside of the bathroom. Counsel's performance, which did not include

conducting independent tests on the door, did not fall below an object standard of reasonableness. Furthermore, even were we to conclude otherwise, the Petitioner has not proven prejudice. We, as did the post-conviction court, note that the tests performed on the door for the post-conviction hearing were not conducted under the same conditions that existed at the time of the crime. Specifically, the persons who conducted the test were not in the same physical or mental state as the victim. Further, as we said previously, the proof at trial was that the bathroom door was locked form the inside and not that the screwdriver alone locked the door. Under these circumstances, we conclude that the Petitioner has not proven prejudice and is not entitled to relief on this issue.

### b. Exculpatory Evidence

The Petitioner next contends that Counsel was ineffective for failing to properly investigate the issue of whether the State fulfilled its duty to provide exculpatory evidence. The State asserts that Counsel was not ineffective, and, further, because the evidence was disclosed, the Petitioner has not shown prejudice. The post-conviction court found that this issue was previously decided on direct appeal. Further, the post-conviction court stated the general conclusion that it "finds that no prejudice in a Post Conviction sense fell upon the [Petitioner] in regards to his counsel's conduct upon direct appeal." In addressing this issue on direct appeal, this Court concluded the following:

> In this instance, the information does not fall within the rule of Brady because the information, although delayed was disclosed. Brady only applies to a complete failure to disclose exculpatory information and does not apply to delayed disclosure unless the delay itself causes prejudice. Because disclosure was delayed and not denied, the [Petitioner] must demonstrate prejudice in order to qualify for relief. The trial court granted a lengthy continuance so that the [Petitioner] could attempt to locate the individual who made the comment. Although the [Petitioner] was unable to find the potential witness, the record does not establish that the inability to locate the witness was the result of the delayed disclosure. Officer Osterman was unable to provide a description, other than the fact that he was white, making it unlikely that an earlier disclosure would have assisted the [Petitioner] in identifying the individual. In our view, the [Petitioner] has failed to demonstrate that he was prejudiced by the delayed disclosure of this statement.

Thompson, 2003 WL 1202979, at *13 (citations omitted).

We conclude that the Petitioner has not shown that Counsel's failure to investigate the State's compliance with its duty to provide exculpatory evidence fell outside the range of competence demanded of attorneys in criminal cases. This Court determined that the evidence, although delayed, was disclosed to Counsel, and the Petitioner was not able to show, on direct appeal, that this delay caused him prejudice. Id. Further, Counsel interviewed the officers at the scene, including Officer Osterman, and he was not told of a third-party statement at that time. When Counsel learned of the statement, he proceeded to investigate and he further questioned Officer Osterman. We cannot conclude that the Petitioner has met his burden of showing how Counsel's performance prejudiced

-26-

him.  He is, therefore, not entitled to relief on this issue.

### c. Grand Jury Foreman

The Petitioner contends that Counsel was ineffective because he failed to investigate and determine whether the grand jury foreman was authorized to serve by law.  Specifically, the Petitioner raises the issue because the grand jury foreman was the same person who voted to indict the Petitioner in a prior matter or matters.  The post-conviction court stated:

> [The] Petitioner says that his original attorney was ineffective for not attacking the long tenure of the Grand Jury Foreman, Art Salyers. . . . The [P]etitioner, in his testimony, seems to have concluded that Art Salyers had served too long. . . . Based upon the evidence presented at hearing, this issue is totally without merit.

The Petitioner admits in his brief that this Court has previously decided that a grand jury foreperson may serve longer than the statutory term of two years.  See Nelson v. State, 499 S.W.2d 956, 956 (Tenn. Crim. App. 1972) (holding "[w]e find no authority holding and can think of no valid reason why a grand jury foreman appointed for two years under [the statute] is disqualified to serve longer either by reappointment or holding over.").  Accordingly, we see no valid argument that the grand jury foreman was improperly authorized or that Counsel was ineffective.  This issue is without merit.

### 3. Trial and Sentencing

The Petitioner next contends that Counsel was ineffective when Counsel represented him during trial and at sentencing.  Specifically, he asserts that Counsel ineffectively: (1) addressed an eyewitness statement; (2) failed to object to a jury instruction concerning his fine; and (3) allowed the trial court to deny the Petitioner's right to allocution at the sentencing hearing.

### a. Witness Statement

The Petitioner contends that Counsel was ineffective by failing to mention, during opening arguments, a witness' statement heard by Officer Osterman or to introduce evidence of this statement during trial.  A witness told Officer Osterman that another black male, not the Petitioner, was at the crime scene prior to the commission of the crime, and the Petitioner contends that Counsel was ineffective because the jury never heard this statement.  The State counters that Counsel was not ineffective for failing to introduce the statement, and, further, the Petitioner has not demonstrated that he was prejudiced because, during trial, the trial court ruled that this statement was inadmissible hearsay and this Court affirmed that ruling on appeal.  The post-conviction court concluded that there was no merit to the Petitioner's claim.

The evidence presented at the post-conviction hearing showed that Counsel learned about this statement late in his investigation of this case, and he sought a continuance to investigate the statement further and attempt to locate the witness.  Counsel could not locate this witness, and he

did not mention the statement in opening argument because he anticipated that the trial court might rule that it was inadmissible hearsay. Counsel explained to the Petitioner that he felt that it was improper to mention the statement in opening argument before the trial court had the opportunity to decide whether this statement was hearsay. The trial court did, in fact, rule that this statement was inadmissible, and Counsel raised this issue on appeal. This Court affirmed the trial court's ruling about the statement. Thompson, 2003 WL 1202979, at *14. We fail to see how Counsel's representation fell below an objective standard of reasonableness. Further, the Petitioner has in no way shown prejudice in this regard. The Petitioner is not entitled to relief on this issue.

### b. Jury Instruction Regarding Fine

The Petitioner next asserts that Counsel was ineffective for failing to object to the trial court's instruction, prior to deliberations, regarding the amount of fine to be imposed. The State contends that the instruction was proper, and, therefore, Counsel was not ineffective. The post-conviction court held the following:

> Each of the crimes the [P]etitioner was convicted of carried fines of in excess of fifty dollars ($50). The Tennessee Constitution requires that any fine in excess of fifty dollars ($50) be set by a jury unless the defendant voluntarily agrees otherwise. Tennessee Constitution, Article 6, sec 14. State of Tennessee v. John Thomas Scopes, 154 Tenn. 105, 289 SW 363, 367 (Tenn. 1926). . . . This issue is totally without merit.

The trial court's instruction to the jury regarding the fines to be imposed was proper. The Petitioner failed to prove that Counsel was ineffective for not objecting to the trial court's instruction. Moreover, even if we were to find that Counsel erred, the Petitioner has failed to show a reasonable probability of reasonable doubt "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### c. Allocution

The Petitioner next asserts that Counsel was ineffective for failing to request that the trial court allow the Petitioner the right of allocution at the sentencing hearing. The State contends that the Petitioner chose not to speak at the sentencing hearing, and, therefore, Counsel was not ineffective. Further, the State asserts that the Petitioner has not shown prejudice. The post-conviction court reasoned the following:

> At the sentencing hearing, the [Petitioner] and his attorney did not ask the Court that the [Petitioner] be allowed to make an uncross-examined statement prior to sentencing. . . . In death penalty cases tried by a jury, case law has indicated that there is not [a] constitutional right . . . of Allocution, but in some recent cases, it has been held that there is a right of Allocution where the judge is conducting a

sentencing hearing. . . . The [P]etitioner although stating that he did not ask to make a statement at sentencing, the trial judge had a duty to inform him of his right of Allocution. . . . The [P]etitioner says he was prejudiced by not being able to point out his opinion that the case was a close one (sufficiency of the evidence), various legal errors, and that the jury or the Court was misled by the testimony of Officer Brookshire (seemingly concerning the screwdriver theory). . . . Assuming it is required that the trial court point out the right of Allocution, the thing the [Petitioner] wanted to say would go to a Motion for New Trial, to wit: the sufficiency of the evidence, Anthony issue, etc. that were raised on appeal.

Further, if an objection is not made at trial, the issue is waived. . . . Also, the [P]etitioner has not established prejudice. This issue is without merit and no prejudice is shown.

Allocution has been defined "as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." State v. Stephenson, 878 S.W.2d 530, 551 (Tenn. 1994) (citing BLACK'S LAW DICTIONARY 76 (6th ed. 1990)) (footnote omitted). It is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." BLACK'S LAW DICTIONARY 75 (7th ed. 1999); see also United States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001). Tennessee Code Annotated Section 40-35-210(b)(7)(2003) mandates that, in a non-capital case, a defendant be allowed allocution before a sentencing judge or jury. This section provides, "To determine the specific sentence and the appropriate combination of sentencing alternatives that shall be imposed on the defendant, the court shall consider . . . [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing." Tenn. Code Ann. § 40- 35-210(b)(7). "The trial judge, in determining the appropriate sentence . . . shall consider, among several factors, any statement the defendant wishes to make in his own behalf about sentencing . . . ." Stephenson, 878 S.W.2d at 551.

Clearly, any defendant's right to allocution is dependant on that defendant's desire to make a statement. In the case under submission, the evidence showed that Counsel asked the Petitioner prior to sentencing whether the Petitioner wanted to testify on his own behalf or make a statement. After sentencing, the Petitioner mentioned to Counsel that the trial judge did not ask the Petitioner if he wanted to speak, and the Petitioner told Counsel that the trial judge's failure gave the Petitioner a ground for appeal. Counsel explained to the Petitioner at that time that the Petitioner had every right to speak but had chosen not to do so. The Petitioner chose not to execute his right to allocution. The Petitioner has failed to prove that Counsel was ineffective, and he has failed to prove how he was prejudiced. Accordingly, we conclude that the Petitioner is not entitled to relief on this issue.

### 3. On Appeal

The Petitioner asserts that Counsel was ineffective when he represented him on appeal. We employ the same two-prong standard that is used in considering claims of ineffective assistance of trial counsel to evaluate allegations of ineffective assistance of appellate counsel. See, e.g. Porterfield v. State, 897 S.W.2d 672, 677-78 (Tenn. 1995). Typically, a decision regarding which issues should be raised on appeal is one that is left to the professional judgment and sound discretion of appellate counsel. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Porterfield, 897 S.W.2d at 678.

### a. Response Brief Regarding Factual Misstatements

The Petitioner asserts that Counsel was ineffective for failing to address factual misstatements in the State's brief. Specifically, he states that he prepared a brief addressing these issues, delivered the brief to Counsel, but Counsel failed to file the brief. The State contends that Counsel and the Petitioner discussed the issues to be raised on direct appeal, and those issues were addressed in Counsel's brief. Therefore, The State asserts that the Petitioner has not shown how Counsel was ineffective, and, further, he has not shown prejudice. The post-conviction court opined:

> As a general statement of law, appellate counsel may exercise reasonable discretion as to how [to] present a case on direct appeal and what issues to present. Issues raised or to be raised must be viewed in light of the "strategic value" of limiting the number of arguments presented on direct appeal.
>
> Here the Court finds that no prejudice in a Post Conviction sense fell upon the [Petitioner] in regards to his [C]ounsel's conduct upon direct appeal.

The evidence at the post-conviction hearing proved that Counsel reviewed the Petitioner's supplemental brief for any issues that had merit. Finding none, Counsel submitted a brief based upon the issues that Counsel thought were properly appealed. Counsel used his professional judgement and sound discretion to determine the issues that had merit. We conclude that Counsel's performance in this regard was within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. Further, the Petitioner has failed to prove prejudice. Accordingly, the Petitioner is not entitled to post-conviction relief on this issue.

### b. In-Court Identification

Next, the Petitioner contends that Counsel was ineffective for failing to address the issue of an allegedly illegal in-court identification on direct appeal. The Petitioner asserts that the victim, Huffman, stated on direct examination that she found a receipt from Montgomery Ward that was signed by "Jo Jo Thompson." During cross-examination, Huffman admitted that the receipt was signed by "J. Thompson." The Petitioner asserts that the nickname "Jo Jo" was given to him by the police department, and it is not a nickname that he uses. He asserts that Counsel's failure on appeal

to challenge the victim's use of this nickname deprived him of a fair trial and calls into question the reliability of the outcome of this case. The State asserts that Counsel was not ineffective because he determined that this was not an issue that could properly be raised on appeal. The post-conviction court found that this issue was without merit.

The evidence at the post-conviction hearing proved that, when Huffman testified, she said that she did not know the Defendant, had never seen him, and could not identify him as her attacker because her attacker wore a ski mask. She also testified at trial that she could not identify the Defendant's signature. Counsel said that the Petitioner did not like the nickname "Jo Jo" and that the victim should only refer to him by his given name, Joseph, or his nickname Joe. Counsel testified that he discussed this issue with the Petitioner, explaining to the Petitioner that while the victim referred to him using the nickname, it did not affect the Petitioner's case. Further, Counsel said that when he cross-examined the victim, she testified that the receipt was signed by "J. Thompson." Counsel determined that this issue would fail if pursued in the direct appeal. We conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel's performance in this regard was within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. Furthermore, the Petitioner has not shown that he was prejudiced. Therefore, the Petitioner is not entitled to relief on this issue.

### c. Prejudicial Photographs

The Petitioner asserts that Counsel was ineffective because he failed to demonstrate in the direct appeal, by citing more clearly to the record, that the introduction of prejudicial photographs warranted a new trial. Specifically, the Petitioner contends that Counsel did not place particular emphasis on enough citations to the record to convince the Court of Criminal Appeals that the in-court identification was so unreliable that it would require a new trial. The post-conviction court addressed this issue in the context of Counsel's general appellate performance and stated:

> As explained above, the Appellate Court cannot and are not required to enter a detailed finding on every detail that might be contained in an Appellate record. This does not mean they did not fairly review the record. . . . [A]ppellate counsel may exercise reasonable discretion as to how [to] present a case upon direct appeal and what issues to present. Issues raised or to be raised must be viewed in light of the "strategic value" of limiting the number of arguments presented on direct appeal. Here the Court finds that no prejudice in a Post Conviction sense fell upon the [Petitioner] in regards to his counsel's conduct upon direct appeal.

We conclude that the evidence does not preponderate against the post-conviction court's findings. The Petitioner fails in his brief to state which pictures were prejudicial, and why they were prejudicial. Further, this Court reviewed this issue on appeal, finding that there were adequate citations so as not to waive this issue. We cannot conclude that the Petitioner has met his burden of showing that Counsel's performance was deficient. Further, because we addressed this issue on its merits on direct appeal, we fail to see how the Petitioner was, in any way, prejudiced.

Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### d. Petition to Rehear

Next, the Petitioner contends that Counsel was ineffective for failing to file a petition to rehear in order for this Court to reconsider its opinion because of erroneous facts. See Tenn. R. App. P. 39(a)(1). The State asserts that Counsel was not ineffective because he did not believe sufficient grounds existed to file a Rule 39 petition to rehear, and, further, the Petitioner has not shown prejudice. The post-conviction court stated:

> [T]he issue concerning failure to file a Rule 39 motion is without merit. It is not a routine duty that Appellate Counsel file a Rule 39 motion. Obviously, the opinion on direct appeal was detailed and balanced. A reasonable appellate attorney would not be expected to file a Rule 39 motion in such circumstances.

The proof does not preponderate against this finding. We conclude that the Petitioner has failed to meet his burden of showing that Counsel's performance was deficient. Further, he has not proven prejudice.

### e. Withdrawal and Contract

Finally, the Petitioner contends that Counsel was ineffective because he failed to timely withdraw as Counsel, and, as a related issue, he asserts that Counsel failed to adhere to the terms of a contract with the Petitioner. The post-conviction court concluded the following:

> The [P]etitioner says his trial and appellate counsel did not withdraw timely after the [P]etitioner had sued him in a *pro se* civil action. . . . [The] Petitioner says he sued his [Counsel], but [Counsel] did not seek withdrawal before the Tennessee Court of Criminal Appeals until the time had run for filing a Rule 39 Motion to Rehear. Therefore, he says [Counsel] was ineffective [on appeal].
>
> Evidently, the [P]etitioner wanted the Court of Criminal Appeals to rehear the Brady/Ferguson issue and the exception to the hearsay rule discussed by Judge Wade upon direct appeal. . . . The Post Conviction Court cannot instruct the Tennessee Court of Criminal Appeals to conduct any hearing or require them to file additional minute findings of law or fact. . . . On direct appeal, the Brady/Ferguson issue was heard and became a portion of the Criminal Court of Appeals opinion on direct appeal. Further, a Rule 11 T.R.A.P. motion was filed with the Supreme Court.
>
> It would be rank speculation for this Court to hold that a *pro se* Rule 39 T. R. App. P. motion would have availed the [Petitioner] anything.

The issue that appellate counsel was ineffective is totally without merit.

The evidence at the post-conviction hearing proved that the Petitioner filed multiple motions with this Court attempting to have Counsel removed, and we determined that there was not just cause for Counsel's removal. The Petitioner sought to have Counsel removed because Counsel refused to include, in the brief prepared by Counsel, all of the issues contained in the Petitioner's pro se supplemental brief. The Petitioner believed that, had Counsel withdrawn, the Petitioner would have been able to successfully file his pro se supplemental brief. Counsel said that he reviewed the Petitioner's pro se brief for issues that had merit, and there were none. Counsel determined that his brief addressed all the issues appropriate for appeal. Counsel learned that the Petitioner had filed a civil law suit against Counsel twelve days after oral argument, and, once he learned of this lawsuit, he filed a motion to withdraw from the case. We conclude that the Petitioner has failed to prove that Counsel's performance fell below the standard of reasonably effective assistance. Further, the Petitioner has failed to prove prejudice because he failed to prove that any issues raised in the Petitioner's supplemental brief would have successful on appeal. Accordingly, the Petitioner is not entitled to relief on this issue.

### B. Other Issues
### 1. Issues Previously Raised On Direct Appeal

The next two issues presented by the Petitioner are previously determined because they were previously raised on direct appeal. The Petitioner contends that the State intentionally or negligently caused exculpatory evidence to become lost and unavailable to the Petitioner. The Petitioner alleges that the trial court erred in allowing Counsel only forty minutes for closing arguments. The post-conviction court stated the following:

> The [P]etitioner in great part basically raised exactly the same issues that were raised upon direct appeal. Although issues raised upon direct appeal cannot again be raised in a post conviction hearing . . . the [P]etitioner took the position that maybe if original trial counsel had asked a few more questions here or there or asked them in a different light, the Appellate Court may have ruled differently on the issues.

> This Post Conviction Court gave counsel some leeway in developing the theory, but the end result of the testimony was that the [P]etitioner was only stating conclusions or theories upon issues already decided upon direct appeal.

> The Post Conviction Court concluded at the end of the hearing that the basic issues were attacking the things addressed upon direct appeal, and such attacks are prohibited by the 1995 Post Conviction Act. The Court nonetheless will make various findings below and review issues not raised on direct appeal.

The 1995 Post Conviction Act provides that:

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-106(h).  Regarding the exculpatory evidence, we conclude that this issue was previously determined on direct appeal, as this Court found that the information, although delayed, was disclosed.  Thompson, 2003 WL 1202979, at *12-13.  As to the issue of the length of closing arguments, we conclude that this issue was previously determined on direct appeal.  This Court found that the Petitioner originally agreed to a thirty-minute time limit but later requested forty-five minutes for closing argument.  Id. at *15.  The trial court then determined that forty minutes for each side was sufficient, and this Court determined that the Petitioner failed to establish that the trial court abused its discretion.  Id.  Accordingly, we conclude that these two issues were previously determined on direct appeal, and, therefore, the Petitioner is not entitled to post-conviction relief.

### 2. Issues Not Raised On Direct Appeal

The next three issues raised by the Petitioner are waived.  The Petitioner contends that the trial court erred in not allowing the Petitioner his right to allocution.  Next, the Petitioner alleges that the trial court erred in ruling that the Petitioner could not instruct his Counsel about trial strategy.  Finally, the Petitioner contends that the trial court erred in instructing the jury about the amount of fines to be imposed prior to deliberations.  A post-conviction court shall dismiss claims which have been waived.  Tenn. Code Ann. § 40-30-106(g) (2003).  "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," with certain exceptions not applicable in the present case.  Tenn. Code Ann. § 40-30-106(g).  Because these issues could have been raised on direct appeal, we conclude that these issues are waived in this post-conviction proceeding pursuant to code section 40-30-106(g).  Accordingly, we conclude that the Petitioner is not entitled to relief on these issues.

Further, we note that the Petitioner is not entitled to plain error review of these issues because "the plain error doctrine has no application in post-conviction relief proceedings."  Corwyn E. Winfield v. State, 2003 WL 22922272, at *5 (Tenn. Crim. App., at Jackson, Dec. 10, 2003), *perm. app. denied* (Tenn. May 10, 2004); see also State v. West, 19 S.W.3d 753, 756-47 (Tenn. 2000).  We conclude, therefore, that these issues are waived.

### III.  Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.


_____
ROBERT W. WEDEMEYER, JUDGE